## HUBERT ROBERTSON v. THE STATE.

### No. 4488.  Decided May 23, 1917.

1.—Burglary—Evidence—General Reputation.

Where, upon trial of burglary, the defendant testified and was contradicted by testimony for the State, he should have been permitted to introduce testimony of his general reputation for truth and veracity.

2.—Same—Evidence—Confession—Arrest—Involuntary Statement.

Where, upon trial of burglary, the State was permitted to introduce the involuntary written confession of the defendant made while he was under arrest, the same was reversible error, which was not cured by submitting the issue as to whether they were voluntary or not to the jury.

Appeal from the District Court of Bell. Tried below before the Hon. F. M. Spann.

Appeal from a conviction of burglary; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Will Glover* and *N. P. Woodward*, for appellant.—On question of con-

fessions: Carter v. State, 37 Texas, 362; Nolen v. State, 8 Texas Crim. App., 585; Paris v. State, 35 Texas Crim. Rep., 82; Johnson v. State, 48 id., 423; Lauderdale v. State, 31 id., 46; Parker v. State, 46 id., 461; Galliger v. State, 28 S. W. Rep., 288; Cain v. State, 18 Texas, 387; Warren v. State, 29 id., 370; Bramm v. United States, 168 U. S., 532.

On question of general reputation of defendant for truth and veracity: Butler v. State, 52 Texas Crim. Rep., 528; House v. State, 42 id., 125; Farmer v. State, 35 id., 270; Luttrell v. State, 40 id., 651; Wilkerson v. State, 60 Texas Crim. Rep., 388, 131 S. W. Rep., 1108; Mathews v. State, 80 Texas Crim. Rep., 177, 189 S. W. Rep., 491.

*E. B. Hendricks,* Assistant Attorney General, for the State.—On question of confessions: Collins v. State, 20 Texas Crim. App., 399; Sands v. State, 30 id., 578; Sparks v. State, 34 Texas Crim. Rep., 86; Paris v. State, 35 id., 83.

On question of general reputation: Britt v. State, 21 Texas Crim. App., 215; Rushing v. State, 25 id., 607; Jones v. State, 74 Texas Crim. Rep., 205, 167 S. W. Rep., 1110; McCue v. State, 75 Texas Crim. Rep., 157, 170 S. W. Rep., 280.

DAVIDSON, Presiding Judge.—Appellant was convicted of burglary, his punishment being assessed at two years confinement in the penitentiary.

There are two questions which require a reversal of the judgment. Appellant offered testimony of his reputation for veracity, which was rejected by the court. That may be disposed of by stating it was admissible on account of the contradictions with reference to appellant's statements and accounts of the burglary used against him and his connection with it as shown by what is termed confessions. Wherever a witness is contradicted by showing he made contradictory statements out of court from those made in court, we have always understood the rule to be that his reputation for truth and veracity can be sustained. A bill of exceptions was reserved to the admission of a purported confession made by appellant to the then district attorney. The bill is very full, with questions and answers, and the confession, and testimony bearing upon it. The proposition involved in it is that it was not a voluntary confession. In order that there may be no question as to the exact attitude of the matter as shown by the bill of exceptions, verified by the court, the whole bill will be copied in full:

"Be it remembered that on the trial of the above numbered and entitled cause, the following proceedings, among others, were had:

"That after the witness DeWitt Bowmer was placed upon the stand by the State, who identified a written statement or confession made by the defendant as having been made to the witness while he (the witness) was district attorney of Bell County, Texas, the State then offered in evidence said written statement or confession of the defendant,

to which the defendant objected because he was under arrest in charge of an officer and in confinement at the time said written statement or confession was made, and because the same was not freely made, and was not the voluntary statement and confession of the defendant, but was a written statement and confession of the defendant procured by the witness DeWitt Bowmer, the then district attorney, by force, threats and abuse, and through fear of serious bodily injury, and after severe cross-examination by the witness DeWitt Bowmer, who was at the time said statement and confession was made district attorney of said Bell County, and after said witness DeWitt Bowmer had threatened to prosecute defendant for the offense of perjury if he did not make the confession, and send him, the defendant, to the penitentiary for a longer period of time than he could or would for burglary; after which objection the jury was withdrawn, and the following testimony of the witness DeWitt Bowmer was introduced before the court:

"Direct examination by Mr. White, for the State: Q. Mr. Bowmer, was that statement made to you? A. Yes, sir. Q. That warning printed in the statement was given the defendant? A. The whole statement, including the warning, was read to the defendant. Q. Before signing? A. Yes, sir. Q. And the defendant signed it in the presence of the two gentlemen who appear as witnesses? A. Yes, sir. Q. These two gentlemen were not officers? A. I do not think they were, but my best judgment is that they were not. Cross-examination by Mr. Woodward, for defendant: Q. Mr. Bowmer, under what conditions did the defendant make that statement; I mean by that, wasn't he pretty roughly handled before the statement was taken? A. I do not know what you would call roughly handled; I can tell you the circumstance. Q. Well? A. We began to investigate this meat stealing one day over there, and we got on this witness, Robert Swanson and Sam Lane, and his wife, and the whole bunch of witnesses, and got a plenty of evidence to know who the guilty parties were, and Hubert Robertson was arrested before that time and brought over to Belton. Well, Pat White, his codefendant, was arrested that day, so after I had all these other statements up there, why, I got Pat White up in the Justice Court and got a confession from him, and I sent back over to Belton by officers coming over here as I remember and got Hubert Robertson out of jail and brought him back. When he first came over he claimed that he knew nothing about it, and told some kind of a story about it, I forget just what he said now, but anyway I did not think he was telling the truth, and I started in to make him tell it if I could, and so he told about three different stories, and he finally made this statement. Q. You told him you were going to whip him, and some of the boys did hit him? A. I can not say that anybody hit him; I did not hit him. I started to once or twice, and ought to have, I guess, because he was an impudent negro, but I did not hit him. If any of the boys hit him I do not remember it. If they did it was unjust, because I was the one going after the negro. I had the confession of

Pat White, and I thought this negro was guilty, and I used such means as I thought was calculated to make him tell the truth. Q. You threatened you were going to hit him? A. I do not know whether I did or not; I have so many times told them that that I do not remember. Q. You expect you did? A. As I remember it, the negro kept telling what I did not think was the truth, and I finally said, 'I am going to let you go, I had rather you tell a lie than the truth anyway, because then I will indict you for perjury and send you to the penitentiary for a longer term than I could for burglary.' I can not remember what I said to the negro because I had so many. Q. But you did intimate that what he did tell you was a lie, and you were going to send him to the pen for that? A. I told him I did not think he was telling a lie. Q. This is not a voluntary statement? A. I do not know, Mr. Woodward. Q. The negro was under arrest? A. It was my understanding they came to Belton and got him out of jail. Q. And you asked him questions and he answered them, and from that you made up the statement? A. Yes. Q. And everything in there was in response to questions asked? A. Yes. · Q. After he had made, I believe you said, three different stories? A. Two or three; I had him up there, I reckon, an hour. Redirect examination by Mr. White: Q. After all the preliminary statements were made and this statement was written down, was it read over to the defendant? A. Yes, sir. Q. Did he make any objection to signing it? A. No, sir. Q. And was written down as he finally made it? A. Yes, sir. Q. And that was his statement? A. Yes, sir. Q. You did not compel him to sign that statement by threats or any other matter? A. No, I am sure that I did not on signing the statement. I do not remember. I expect I talked to the negro pretty roughly to make him tell what I thought was the truth, because I thought he was a little bit too defiant about the matter, but that was not about signing the statement; that was about the statement he was giving; there was no objection about signing the statement as given, and there was no coercion or abuse to cause him to sign. All that was said was said before this statement was written. The court: What did you say to him? A. I do not remember all I said to the negro; I think I said to him—maybe I cursed him a little. The court: You did curse him? A. Maybe I threatened to strike him. The court: Was there a 'third degree' proceeding? A. I do not know what you call the third degree; I felt like the negro was not telling the truth, and I thought I could get the truth out of him; I knew he was guilty, felt that way about it, and I felt like I was justified in using such means; I told him he was a liar and all such things as that. Q. Anybody else talk to him besides you at that time? A. Mr. Cooper was in there and out; I do not know whether he was in there at the time or not. This investigation lasted two days; we had every negro out of the bottom up there, and Mr. Cooper was in there a part of the time and Mr. Gray was there a part of the time. Recross-examination by Mr. Woodward: Q. Didn't Mr. Gray threaten to run him in for living

with a negro woman if he did not tell it? A. I do not remember that; it could have happened. Q. You did abuse him and call him a liar? A. Yes, I called him a liar. Q. Possibly might have called him a son-of-a-bitch? A. I do not know whether I did or not, Mr. Woodward; I ought not to have if I did, but I might have. And that after said foregoing questions were propounded to said witness by the State and by the defendant, in the absence of the jury, the jury was then recalled and the same evidence as before set out was then offered before the jury, whereupon the court overruled defendant's objection to the introduction of said statement, and the State then offered in evidence and read before the jury the before mentioned statement, which statement is as follows, towit:

"The State of Texas,                    November 4, 1916.
   "County of Bell.

"My name is Hubert Robertson. I am under arrest in the custody of Jerry Gray, constable of Pre. No. 5 of Bell County, Texas, and have been duly warned by DeWitt Bowmer, of Bell County, Texas, the person to whom I am making the following statement: That I do not have to make any statement at all; that any statement made by me may be used in evidence against me on trial for the offense concerning which this confession and statement is made, do now make the following statement:

"Some time in Jan'y, 1916, Pat White and I got Louis Newsom's horse and buggy in Temple and drove out to Mr. W. H. Hutchinson's place on Big Elm about 7 or 8 miles from Temple and stole some meat and lard out of Mr. Hutchinson's smoke house at night-time. Pat and I first discussed going out to Hutchinson's on Saturday afternoon before we went that night. Louis Newsom hitched the horse up for Pat White and I. Pat and I got out to Mr. Hutchinson's house about 10 o'clock p. m. There was a light in Mr. Hutchinson's house and someone came out on the porch and went back in the house, and Pat says everything is all right now. Pat and I then went up to the smokehouse and went inside. I began feeling around in the smokehouse; it was dark inside, and felt a lard can. I took the lid off to see what the can contained; it was full of lard. Pat was on the other side of the smokehouse and called me over to him; he had found some fresh meat salted down and in box, and I held a sack which we had brought with us, while Pat filled it full of meat; it was so heavy Pat couldn't carry it, so I carried the meat and Pat got a can of lard. We took them a little ways from the house, set the lard and meat down and both of us went back to the smokehouse and got another can of lard; we then loaded the two cans of lard and the sack of meat in the buggy and came back to Temple; we stopped our buggy in front of Louis Newsom's in Temple when we got back; we went in Newsom's house, told him what we had, and Newsom gave me a drink of whisky; then Pat, Newsom and I went out to the buggy, and then carried the meat and one can of lard in Newsom's house, and gave him some meat and

Newsom set a big dishpan on the table and we filled it very full of lard. Robert Swanson came by the buggy after I had come back out of the house, and I showed him the remaining lard and meat. Pat took his part of the meat and I took my part over to Sam Lane's and left it in Sam's smokehouse that night, and Sam told me the next day to take it away and I took it away Sunday night, being the next night following the stealing of the same, and sold it to John McNeese for $3; we did not have Mr. Hutchinson's permission to get the meat and lard.

"The door of the smokehouse that night was closed but not locked.

                    (Signed)        "Hubert Robertson.

"Witnesses:
  "C. S. Alexander,
  "J. K. Wood.

"And after which said statement before set out was read in evidence before the jury, the State then placed upon the stand C. S. Alexander, who, after being sworn, testified in substance as follows:

"My name is C. S. Alexander. This signature as a witness to this statement is my signature. I was present at the time that instrument was signed by the defendant, Hubert Robertson. I do not remember just the date it was signed, but I went downtown that night and was standing on the corner by the popcorn wagon and J. K. Wood came up and said, 'Would you have any objection to going to Cooper's office and witnessing some testimony?' and said, 'We have to have someone else besides an officer,' and when I got in the courtroom Mr. Bowmer had taken his testimony and had it written out when I got up there and he read it over to him, called his attention to it, and said, 'I will read this testimony over and be careful and if there is any mistake correct me,' and he read it slowly and carefully and when he' got through he said, 'Is that correct?' and he said it was, and said, 'Will you sign it?' and he said, 'Yes,' and he turned to me and said, 'Mr. Alexander, will you witness this?' and I said, 'Yes,' and he signed it and I signed it. There was no threats made toward the defendant while I was there to induce him to sign any instrument. It was read over to him two times.

"I do not know what was said or done to the negro before I went up there.

"And the State then called R. L. Cooper and placed him upon the stand, who testified in substance, on behalf of the State, as follows:

"My name is R. L. Cooper. I do not hold any official position now. Up to the 20th of November I was justice of the peace at Temple, and held that position on November 4, 1916. I remember of the circumstance of the examination of some witnesses in regard to the theft of some meat from Mr. Hutchinson. There was two statements taken from Hubert Robertson; I was present all the time during the first and the second; I do not recall whether I was there all the time or not, I was probably in and out. I do not recall whether I was there all the time this statement was made that is witnessed by Mr. Alexander and Mr. Wood; I was there when Mr. Alexander came in and signed this as

a witness. I remember that, and I think *I was* the signature of Jake Wood. Hubert Robertson was warned as such cases are always done, that he did not have to make a statement, and Mr. Bowmer went ahead and took his statement. I was in and out probably at times; I would be in and hear part of it. I do not recall that I was in all the time, I do not believe that I was because I was attending to my affairs all the time and usually when the attorneys are there to take the statements I pay very little attention to it.

"Mr. Bowmer was there all the time and took the last statement; I think A. D. Dyess took his first statement. The first statement was taken before he was brought to jail. I remember some parts of that statement; in that first statement he did not admit going to old man Hutchin's and getting that meat. He told how he got the meat he did sell in the first statement and it did not incriminate him in the way of a burglary from Mr. Hutchinson. The time the warning was made was not at the time it was read over to him, it was given to him before it was ever written; that is the customary rule, and I think it was done in that case; I usually do those things myself. I can not say that I warned him at the time Mr. Bowmer came back to get another statement. Mr. Bowmer might have. It is not very likely that if any warning was given him that Mr. Bowmer gave it, it is very likely I did myself; but I can not testify that I did or did not, and my testimony on that is based on my custom.

"And the defendant then and there in open court, at the time said written statement or confession was offered, objected for the reasons before given; and the court, over the objection of the defendant, as aforesaid, admitted said written statement or confession and permitted same to be read to the jury, to which actions and rulings of the court the defendant then and there in open court excepted for the reasons before given, and here now tenders this his bill of exceptions and asks that same be signed and filed as a part of the record herein, which is accordingly done, but with the following explanation and modification, towit:

"It appearing to the court that there being a conflicting issue as to the facts surrounding the confession as to whether or not same was voluntary, the witness DeWitt Bowmer, the then district attorney, who took the confession, and the witnesses Alexander and Cooper, stating that same was made in accordance with the requirements of the statute and the defendant denying that same was so made, it was a question of fact for the jury to determine, and they were so instructed.

"F. M. Spann, District Judge, Presiding.
"Will Glover, N. P. Woodward, Attorneys for Defendant."

The remaining bills are largely upon the same line. Appellant's contention was that he was not present at the burglary and had nothing to do with it. This confession which was introduced against him and relied on by the State shows he was present and participated in the burglary. He had made a previous confession or statement denying

that he had anything to do with the burglary, but it was not incriminating as to the burglary and quite unsatisfactory to the State. It connected him with receiving some of the property taken out of the house some hours after it was taken, and with knowledge that it was stolen, but did not make him a principal in the burglary. He might be prosecuted, if those facts are true, for receiving fruits of the crime. He also proved an alibi by a woman who kept house where he was boarding and sleeping. Without discussing this confession and the manner of obtaining it and what occurred in securing it, it is evident from an inspection of what occurred that it could not be and was not a voluntary confession. The court admitted it on the ground that he would leave it to the jury to decide whether it was voluntary or .not, which he proceeded to do in his charge. We suppose the jury must have found that it was voluntary, or they would not have convicted. Wherever there may be an issue as to whether the confession is voluntary or not, it may be submitted to the jury for their determination, but in this case there seems to be no evidence that it was voluntary; the officer who took it excludes the idea that it was voluntary. The facts he states and the manner in which he obtained the ·confession excludes the idea of its ·being voluntary. There is nothing in the case to indicate that the fruits of the crime were discovered by reason of the confession. ˴ They had already been discovered. The record is full of testimony with reference to that matter, and this was either the second or third statement that was obtained from appellant not as to where the property was or anything of that sort, but as to his connection with the original act. A voluntary confession is just what it says and ought to be voluntarily given and not forced or extorted in any manner, even by over-persuasion or promise or threats.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*